IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

LINDA F. RICE                          )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )        Case No.:
                                       )        04-0279-CV-W-REL
JOHN W. SNOW, Secretary,               )
Department of the Treasury,            )
                                       )
                    Defendant.         )

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendant's motion for summary judgment on the grounds that

Plaintiff: (1) cannot establish a *prima facie* case of retaliation on her non-selection claim

but, even if she could, cannot prove that Defendant's proffered reason for non-selection is

mere pretext; (2) did not exhaust her administrative remedies with regard to her claim that

her workload increased after the March 22, 2001, meeting; (3) cannot establish a *prima*

*facie* case of retaliation on her claim of an increased workload following the November

2001 promotions but, even if she could, cannot prove Defendant's proffered reason for

the increase is mere pretext; (4) cannot establish a *prima facie* case on her hostile work

environment claim but, even if she could, cannot prove Defendant's proffered reason for

the alleged harassment was mere pretext; and (5) did not exhaust her administrative

remedies with regard to her handicap discrimination claim.  I find that Plaintiff (1) failed

to establish a *prima facie* case of retaliation based on non-selection; (2) did not exhaust

her remedies with regard to her claim of an increased workload following the March 22,

2001, meeting; (3) failed to establish a *prima facie* case of retaliation based on an increased workload after the November 2001 promotions; (4) failed to establish a *prima facie* case of a hostile work environment; and (5) did not exhaust her remedies on her handicap discrimination claim. Therefore, Defendant's motion for summary judgment will be granted. _____

## I.    BACKGROUND

On March 29, 2004, Plaintiff filed a complaint alleging race, gender and handicap discrimination, as well as retaliation for EEO activity that resulted in the non-selection for an analyst position, a heavy workload and a hostile work environment. During her April 29, 2005, deposition, Plaintiff expressly abandoned her race and sex discrimination claims (Def. Exh. B, at 16-18). Only the handicap discrimination and retaliation claims remain.

On September 30, 2005, Defendant filed a motion for summary judgment and suggestions in support (Doc. No. 46). Plaintiff filed a response in opposition on December 30, 2005 (Doc. No. 55). On January 17, 2006, Defendant filed a reply to Plaintiff's response (Doc. No. 56). In his reply, Defendant argued that summary judgment should be granted since Plaintiff neither controverted the factual basis for the motion nor challenged the legal basis.

I held a teleconference with the parties on January 31, 2006, during which I instructed Plaintiff on how to properly oppose a motion for summary judgment and gave the parties additional time to file amended pleadings. Plaintiff filed her amended

2

response on March 3, 2006 (Doc. No. 61); Defendant filed further suggestions in reply on March 16, 2006 (Doc. No. 60).

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether a genuine issue of material fact exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. Am. Acad. of Family Physicians v. United States, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), aff'd 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. Disesa v. St. Louis Cmty. Coll., 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. Anderson, 477 U.S.

3

at 248.  Factual disputes that are collateral to the substantive law will not preclude summary judgment.  Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine.  A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party.  Id. at 249.  When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor. Id. at 255.  If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted.  Id. at 249-50.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact.  Id. at 323.  If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial.  Anderson, 477 U.S. at 248.  The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.

4

### III.    UNCONTROVERTED FACTS

Below, typed in bold, are the facts offered by Defendant that I find to be uncontroverted by the record before me.

1.      **Linda Rice ("Rice") has been employed in Kansas City by the Internal Revenue Service ("IRS"), part of the United States Department of the Treasury ("Treasury") since 1986. From 1986 until 1995, Rice was a data transcriber, and from 1995 until 1998, a tax examining assistant. She became a GS-7 "Investigative Aide" in the Kansas City Fraud Detection Center ("FDC"), of the Criminal Investigation branch ("CI") of the IRS in 1998. From 1998 through 2000, Rice held a dual position in a department outside of the FDC as a "course developer."  In September 2003, Rice was promoted to a GS-9 "Investigative Analyst" position in the office. She has since held dual positions as a manager in the Data Conversion Department, and has served as a temporary manager at the FDC.**

Plaintiff does not dispute this fact.

2.      **The events at issue in this lawsuit pertain to Rice's employment in the FDC during 2001 and 2002.**

Plaintiff does not dispute this fact.

3.      **The structure of the FDC is as follows: The head of the FDC is referred to as the "Resident Agent in Charge" ("RAC"). Donald Ernst ("Ernst") was the RAC from July 2000 until April 2002, when he left from the FDC and went to the Las Vegas field office. From October 2000 to the present, Jennifer Langley**

5

("Langley") has been the Senior Supervisory Investigative Analyst ("SSIA") of the FDC. As SSIA, Langley reported to the RAC. Three unit managers (currently called "Supervisory Investigative Analysts") ("SIA") reported to Langley. Reporting to each SIA were four GS-9 Investigative Analysts, several GS-7 Investigative Aides, and a clerk.

Plaintiff does not dispute this fact.

4.     In 2003, Rice was promoted to the position of Investigative Analyst in one of the units. During 2001 and 2002, she was an Investigative Aide within the unit. During 2001 and through January 2002, her unit manager, and thus her first-line supervisor, was John Ball ("Ball"). For a little over two months, from January 13, 2002 through March 24, 2002, Steven Daniel Hamilton ("Hamilton") was the acting unit manager for the unit. Langley was Rice's second-line supervisor during her employment at the FDC.

Plaintiff does not dispute this fact.

5.     Investigative Aides within the FDC have a variety of duties. These include analysis of "schemes," which consist of a few, up to thousands, of individual tax return "folders" in which a common pattern of potential tax refund fraud has been detected or is being investigated; handling "referrals," which are potential tax refund fraud schemes detected outside of the FDC and referred to the FDC for review; "scanning" (reviewing) electronic returns ("ELF") and paper returns for various "badges" of fraud; and making phone calls to employers to verify data

6

**claimed. Investigative Analysts assist the Investigative Aides in developing "schemes" by using certain tools, including running "queries" to obtain information, and by assisting Investigative Aides in understanding the significance of information obtained.**

Plaintiff does not dispute this fact.

6. **As part of her job as an Investigative Aide, Rice was required to work on schemes, scan paper and electronic tax returns, work on referrals and run queries.**

Plaintiff does not dispute this fact.

7. **In October 2000, Rice filed an EEO complaint in connection with her position as a "course developer" in an IRS department outside of the FDC. The subject of that complaint was the non-selection of Rice for a course developer position within that other department. The alleged wrongdoer in that complaint was Beth Whited ("Whited"), who was involved in the course developer selection.**

Plaintiff does not dispute this fact.

8. **On December 21, 2001 Rice contacted an EEO counselor with two complaints. The first was that she had been assigned an increased workload after informing management that she had a pending EEO complaint. The second was that she was not selected for a promotional opportunity because of gender discrimination and retaliation for her EEO complaint.**

Plaintiff does not dispute this fact.

7

9.       On March 15, 2002, Rice filed a formal EEO complaint.  The sole form of discrimination or wrong alleged was retaliation for EEO activity.  Rice alleged that she was retaliated against in four ways: (1) Langley participated in a candidate selection for a GS-9 Investigative Analyst position in November 2001, when Rice was not selected for the position; (2) When Langley became aware in March 2001of Rice's 2000 Whited complaint, Rice's workload tripled; (3) When Rice made her current EEO complaint against Langley, Langley had other people start harassing Rice by (a) making fun of her workload, (b) pulling her hair, and (c) calling her names; and (4) Langley also harassed Rice by (a) not letting her move her desk, (b) not ordering for her a back pad and a stapler, as Langley had done for others, (c) not giving Rice overtime when others got overtime, (d) not giving Rice study time when others got it, and (e) not selecting the Investigative Analyst in the manner of previous selections.

Plaintiff does not dispute this fact.

10.       On April 5, 2002, the Treasury Complaint Center sent Rice a letter defining the issues for investigation, and requesting notification if Rice disagreed with the statement of issues.  On April 15, 2002, Rice responded with a letter indicating that she wished to add five issues: (1) that Langley gave one of the Investigative Analysts candidates a mock interview; (2) that the Investigative Analyst with whom Rice was assigned to work was not being of assistance, because she was not running requested "queries"; (3) that one Investigative Aide had been

8

given tools that only Investigative Analysts were supposed to use; (4) that a recently hired Investigative Aide had been approached about becoming an Investigative Analyst; and (5) that during 2001, the selection in which Rice was a candidate was the only selection in which an interview was required.

        Plaintiff does not dispute this fact.

    11.    **After an extensive investigation of Rice's complaints during May and June 2002, Treasury issued a final agency decision denying the claims. The decision was affirmed by the Equal Employment Opportunity Commission.**

        Plaintiff does not dispute this fact.

    12.    **Rice's non-selection claim is that as a result of retaliation, she was not promoted from Investigative Aide to Investigative Analyst in a selection made on November 7, 2001. Specifically, she claims that Langley learned of the Whited complaint in a meeting that Rice had with Langley in March 2001; that Ernst had known of the Whited complaint since 2000; and that they retaliated against her in failing to select her for the Investigative Analyst position.**

        Plaintiff does not dispute this fact.

    13.    **On March 22, 2001, Rice went to Langley's office with a complaint relating to events that occurred on a Saturday when Rice was working overtime. Ball was also at the meeting, at Rice's request. At the time, Ball was Rice's supervisor, but on that Saturday Rick Dutzel ("Dutzel"), one of the other two unit managers within the FDC, was acting in a supervisory role. Rice reported that**

9

Dutzel treated her in a manner that she considered to be inconsiderate. Specifically, he revealed to others information on a "return audit" that he had run, which indicated that Rice had overlooked information upon her review of the return. Rice complained that Dutzel subsequently revealed this to Ball in a loud or indiscreet manner.

Plaintiff does not dispute this fact.

14.     In the course of the March 22, 2001 meeting, Rice commented that she had made an EEO complaint against Whited in 2000. Whited was dating Dutzel in March 2001, and she later married him. Whited was employed in a different section of the IRS in Kansas City. Langley was acquainted with her because of their common IRS employment, but they were not close or social friends.

Plaintiff does not dispute this fact.

15.     Before the March 22, 2001, meeting, neither Langley nor Ball had any knowledge of Rice's EEO complaint against Whited or any other EEO complaint by Rice. Langley had not discussed Rice's EEO complaint against Whited with Whited or Dutzel, and has not done so since. Prior to the EEO investigation of Rice's March 2002 formal EEO complaint, the only knowledge that Langley had about Rice's complaint against Whited was from the statements made to Langley by Rice in the March 22, 2001 meeting. In that meeting, Rice said very little of the substance of the complaint.

Plaintiff does not dispute this fact.

10

16.     In the March 22, 2001 meeting, Rice did not state, and neither Langley nor Ball understood her to be claiming, that Dutzel's actions toward her were a product of discrimination or retaliation. Langley understood Rice's complaint to be that Dutzel had been inappropriately inconsiderate of her in second-guessing her by running the return audit and reporting the result to Ball indiscreetly. Langley discussed the matter with Dutzel, but did not take or threaten to take any action against Dutzel. Dutzel had run return audits on several of the Investigative Aides (including aides assigned to his unit), and provided the other unit managers with the results. Langley considered this an appropriate managerial practice. She believed, after talking with Rice and Dutzel, that the matter was satisfactorily resolved.

Plaintiff does not dispute this fact.

17.     Langley did not hold it against Rice that she had filed an EEO complaint against Whited. She had no opinion on the merit of that complaint. At no time was her knowledge of that complaint (which was gained exclusively from Rice) a motivating factor in any action that she took or failed to take in relation to Rice. Nor did she take any action to disfavor Rice because she had complained about Dutzel's actions.

Plaintiff does not dispute this fact.

18.     Consistently with IRS-wide policies, the general procedure by which

11

promotional selections were made in the FDC in 2001 (and are made today) is as
follows: First, a regional personnel office published a vacancy announcement
specifying the qualifications for the vacant position, soliciting applications, and
specifying what documentation was required to be submitted with the application.
Next, the personnel office delivered the applications to an IRS office where
employees were not likely to be familiar with the applicants for the vacant position -
- typically, in a geographic area remote from the office in which the selection was to
be made.  Then, that office would appoint persons to analyze the applications to
identify a list of the "best qualified" applicants and to assign a ranking score to
each, based on the paper applications.  Finally, that list, with the ranking scores,
was presented to the "selecting official," who had responsibility for the selection.

        Plaintiff does not dispute this fact.

     19.     **During Ernst's tenure as the RAC of the Kansas City FDC, he was the
selecting official on all promotional selections for the Kansas City FDC.  His general
policy on these selections, based on his training and the advice given by personnel
officers, was to use the ranking scores on the "best qualified" list to determine which
candidates to interview, but then to make the selection solely on the basis of the
interviews.  In accordance with the training and advice he received, he made an
exception to this procedure only where there were very distinct breaks in the
ranking scores that permitted him to feel comfortable that he could identify the best**

Case 4:04-cv-00279-REL   Document 63   Filed 04/11/06   Page 12 of 52

candidate or candidates for the position or positions that were open, without interviews.  In the great majority of cases, he based selections on interviews.

    *Plaintiff does not dispute this fact.*

   20. **Ernst consistently appointed a panel of three persons to evaluate the candidates' interview performances.  Typically, the panel consisted of Ernst, Langley, and a person from outside the FDC.  Each candidate would be asked the same questions.  Following each interview, each of the three interview panel members would independently assign a score of 1, 3 or 5 to the answer, depending on its quality, and the total points given by each panel member would be aggregated into a total score by the panel.**

    *Plaintiff does not dispute this fact.*

   21. **During the period that Ernst was the RAC of the Kansas City FDC, fourteen Investigative Analyst positions were filled, in three selections.  Seven of these positions were filled in the first selection, in 2000.  This selection was made entirely on the basis of the interview results, as described in the previous paragraph. In other words, the seven candidates who were selected were those with the seven highest interview point totals.  The second selection was for two Investigative Analyst positions.  In this second selection, Ernst made the selection on the basis of the ranking scores received from the outside review panel, because there was a large gap between the scores of the two candidates who were selected and the scores of the remainder of the candidates.**

13

Plaintiff does not dispute this fact.

22.      **The third selection, for five Investigative Analyst positions, occurred in November 2001. As in the first selection, Ernst did not discern any break in the ranking scores that was sufficiently dramatic to make the selection on the basis of those scores. He appointed himself, Langley, and Cassandra Blackwell, an IRS employee from outside the FDC, as the interview panel.**

Plaintiff does not dispute this fact.

23.      **Ernst asked Langley to determine the interview questions. Langley, in turn, requested a set of questions from the Fresno, California FDC that had been used for a similar selection in Fresno. The questions were provided to Langley and used for the November 2001 selection.**

Plaintiff does not dispute this fact.

24.      **The panel followed the usual interview procedure. Each of the nine candidates was asked the same eleven questions. After each interview, each of the three panelists assigned a numerical score to the candidate's responses to each of the eleven questions. Only the standard three grading numbers were used: from poorest to best, a "1," "3 " or a "5." Next, the total points assigned by all three panelists to all eleven questions were tallied and recorded. A male applicant who had the third highest score was rejected by Ernst because he had no experience within the FDC. The other five candidates with the highest interview scores were selected. Rice was not among them.**

14

Plaintiff does not dispute this fact.

25. **For the eleven questions asked, Langley and Blackwell each gave Rice a total score of 31 points, and Ernst gave her a total score of 29 points.**

Plaintiff does not dispute this fact.

26. **At the time of the third selection, Ernst was aware that Rice had made an EEO complaint relating to her IRS employment. It was his understanding that the complaint related to the alleged actions of an individual outside the FDC in regard to a position selection made outside the FDC while Rice was on detail outside the FDC. He did not know the person against whom the complaint was made, and had no opinion regarding the merit of the complaint.**

Plaintiff does not dispute this fact.

27. **Neither the Whited complaint nor any other EEO activity by Rice was a motivating factor in any action that Ernst took in connection with the November 2001 selection of the Investigative Analyst positions. His decision to base the selection on interviews was unrelated to Rice or any of her activities. The scores he assigned to Rice's interview responses were not affected by her EEO complaint or any EEO activity by her. As in the case of every other candidate for the position, his scoring was based solely on his evaluation of Rice's responses.**

Plaintiff does not dispute this fact.

28. **Blackwell did not work in the FDC and was not aware at the time of**

15

this selection of any EEO complaint or other activity by Rice. Blackwell's

evaluation of Rice was based solely on her independent judgment as to the quality of

responses given by Rice in her interview.

       Plaintiff does not dispute this fact.

    29.    Langley assigned scores for Rice and the other candidates exclusively

on the basis of her judgment as to the quality of the response given to the questions.

Her knowledge of Rice's EEO complaint against Whited (learned of in March 2001),

played no role in the scoring she gave Rice. Nor was she aware, at the time of this

selection, that Rice intended to file an EEO complaint concerning her or the FDC.

She did not discuss with, or mention to, Ernst or Blackwell Rice's EEO complaint

against Whited. Nor did Ernst or Blackwell discuss or mention it. In the course of

the interview and scoring process, neither Langley nor the other panel members

observed anything indicating that any of the panel members scored any candidate's

response on any basis other than that panel member's good faith evaluation of the

response.

       Plaintiff does not dispute this fact.

    30.    Langley offered to undertake mock interviews with Rice immediately

following the November 2001 GS-9 selection, to assist her in securing a GS-9

position in the future, but at that time Rice declined Langley's offer. In 2003, Rice

accepted Langley's offer and Langley assisted her in preparing for an interview for

16

**a GS-9 Investigative Analyst position in the FDC. In September 2003, Rice was a successful applicant for that position.**

Plaintiff does not dispute this fact.

31. **Rice's workload claim, as expressed in her formal EEO Complaint, is that immediately following her March 2001 meeting with Langley and Ball, Rice's workload was tripled. Rice's contention is that this was retaliation by Langley for Rice's 2000 EEO complaint against Whited. Rice stated in her EEO affidavit that this occurred within two weeks of the March 2001 meeting. Rice stated that before the meeting, she had one big "scheme" to handle, and was the back-up for referrals, but that after the meeting, she was assigned twenty-two additional schemes, and was given primary responsibility for referrals, with help from a back-up. Rice stated that with the promotions that occurred as a result of the November 7, 2001 Investigative Analyst selections, she received additional work. She stated that on November 23, 2001, she was assigned the unit's largest scheme (sometimes referred to as "Scheme 47"). She stated that her supervisor Ball told her that Scheme 47 would be "cleaned up" before it was transferred to her, that she would have back-up, and that this would be the only work assigned to her. She stated that on December 1, 2001, Judy McNeil ("McNeil"), who had been handling Scheme 47 and had been promoted, dumped Scheme 47 on Rice's lap without cleaning it up. Rice testified that she had no objection to being assigned Scheme 47, but that she has an**

objection that no one had made sure that McNeil had cleaned-up Scheme 47, and that other projects had not been reassigned from Rice.

Plaintiff does not dispute this fact.

32.     **At no time did Langley take or direct any action to increase Rice's workload following the March 22, 2001 meeting. Neither Langley nor Ernst asked Ball, then Rice's unit manager, to increase Rice's workload before, during or after the March 22, 2001 meeting, or to take any other action against her. The workload of the three units within the FDC is distributed by the unit managers. Langley generally becomes involved in workload distribution issues only when a unit manager has a concern regarding the distribution among units, or an Investigative Analyst or Investigative Aide has a concern about workload distribution within his or her unit.**

Plaintiff does not dispute this fact.

33.     **The number of schemes worked on by an Investigative Aide does not necessarily indicate the volume of work entailed. A scheme may have a lot of activity or no activity at all. It was Ball's experience that the "schemer" (the person who identifies schemes with a common theme and assigns them to Investigative Aides) attempted to treat everyone equally. When Ball assigned work to Investigative Aides, he attempted to treat everyone equally. Work often had to be redistributed among Investigative Aides because of retirements and departures to**

18

other jobs.  Workloads also go up and down, depending on the tax season and during the normal course of business at the IRS.

Plaintiff does not dispute this fact.

34.     **Ball was aware of the Whited complaint as a result of his attendance at the March 22, 2001 meeting with Langley called by Rice, but he did not hold it against Rice that she had filed an EEO complaint against Whited.  Ball had no opinion on the merit of that complaint.  At no time was his knowledge of that complaint a motivating factor in any action that he took or failed to take in relation to Rice.  Nor did he take any action to disfavor Rice because she had complained about Dutzel's actions.**

Plaintiff does not dispute this fact.

35.     **Ball did not take or direct any action to increase Rice's workload in response to the March 22, 2001 meeting.  Nor did the fact that Rice had filed an EEO complaint influence him in the management of Rice or in assignment of work to her.**

Plaintiff does not dispute this fact.

36.     **Hamilton became the acting unit manager of Rice's unit on January 13, 2002, and remained in that position until March 24, 2002.**

Plaintiff does not dispute this fact.

37.     **On February 12, 2002, following Rice's December 21, 2001 contact**

with an EEO counselor, Langley, Ernst, Rice and the EEO counselor met. It was at this meeting that Langley first learned of claims made by Rice in her informal EEO complaint. Rice's complaints, as relayed in the February 12, 2002 meeting, related to two topics only: her non-selection for the GS-9 position in November 2001 and her workload. With regard to the workload complaint, the resolutions resulting from the meeting were (1) that Rice would be responsible for only one scheme (this was "Scheme 47"); (2) she would only do scanning when the program required it for all other Investigative Aides in her unit; (3) Langley would discuss reducing Rice's workload with her current manager (Hamilton); and (4) Rice would consider participating in mock interviews. This last item was included because of observations made by Langley and Ernst that Rice had interviewed poorly during the GS-9 selection.

Plaintiff does not dispute this fact.

38. **Immediately following the February 12, 2002 meeting, Langley went to Hamilton and asked him to comply with the resolutions relating to Rice's workload. She specifically directed him to reduce her workload. She also investigated the matter and concluded that among Investigative Aides, Rice had a higher than average workload, though not the highest. Langley concluded that the higher workload resulted in part because McNeil, who had been handling Scheme 47, was promoted, and the scheme was reassigned to Rice in early December 2001,**

20

while other schemes that Rice had already been handling had not yet been reassigned.

> Plaintiff does not dispute this fact.

39.     Langley followed up approximately two or three weeks later, and found that Hamilton had not yet completed the reassignment.  She again directed Hamilton to complete the reassignment.  Langley and Rice attributed Hamilton's failure to act as promptly as expected to the fact that he was an inexperienced manager and was overwhelmed by the job.  Back-up assistance was assigned to Rice on or about March 13, 2002.  Hamilton's detail as acting manager ended March 24, 2002.

> Plaintiff does not dispute this fact.

40.     Hamilton complied with Langley's directive.  But because of his managerial workload, it took two or three weeks from Langley's original directive for him to comply.

> Plaintiff does not dispute this fact.

41.     Even before Hamilton redistributed some of Rice's workload in March 200[1],[1] it was his perception that Rice's workload was not disproportionate to that of other Investigative Aides in the unit.  He considered it a heavy workload,

---

[1]Defendant's proposed fact actually states that Hamilton's redistribution took place in March of 2002.  This appears to be an inadvertent error, as the remainder of facts proposed by Defendant refer to the alleged increase occurring in March of 2001.

but not significantly heavier than that of Rice's colleagues in the unit. At no time did Hamilton perceive that Rice had been or was being abused or discriminated against with respect to her workload.

> Plaintiff does not dispute this fact.

42. In the course of discovery in this case, Rice abandoned her claims of retaliation related to overtime and study time. That leaves her with the claim that Langley created a hostile work environment by (1) persuading Rice's co-workers to make fun of her workload, pull her hair, and call her names; (2) refusing to let her move her desk; (3) failing to order Rice a back pad and an electric stapler; and (4) failing to require the Investigative Analyst assigned to her to give her more assistance with queries.

> Plaintiff does not dispute this fact.

43. Rice's claims that co-workers made fun of her workload and called her names are related. She claims that two of the Investigative Analysts would run reports on the amount of work that was being turned out by employees in her unit, and announced the results. Rice testified that because she was a fast worker, these reports reflected favorably on her. But because many employees were very slow, they were uncomfortable with Rice's superior work output, and this created a hostile work environment. Also, according to Rice, Hamilton would come to her because she was a fast worker and ask her to finish as much work as possible so that

**his numbers would look good for Langley.  This led to the name calling: "teacher's pet."**

Plaintiff does not dispute this fact.

44.     **Rice identified Sheila Urum-Eke ("Urum-Eke") as the co-worker who pulled her hair.  She testified that Urum-Eke would yank her braid.  Rice claims that she told Langley of this, and Langley told her to talk to Urum-Eke.  Rice testified that when she would do so, the hair pulling would not happen for a period, but then would happen again.**

Plaintiff does not dispute this fact.

45.     **Before being interviewed by an EEO investigator in June 2002, Urum-Eke had no knowledge of Rice being involved in an EEO claim.  Urum-Eke stated that she works with hair and may have "flipped" Rice's ponytail, but stated that she did not get negative feedback from Rice.**

Plaintiff does not dispute this fact.

46.     **After Rice complained to Hamilton about Urum-Eke pulling Rice's hair, Hamilton told Rice to speak with Urum-Eke and tell Urum-Eke her concerns. Hamilton heard nothing further from Rice about the matter and considered the matter to have been resolved.**

Plaintiff disputes this fact, stating that Hamilton did not take any action upon receiving her complaints.

In support of this fact, Defendant cites paragraph seven of Hamilton's declaration:

> After Rice complained about Urum-Eke pulling Rice's hair, I told Rice to speak with Urum-Eke and tell Urum-Eke her concerns. I heard nothing further from Rice about this matter and considered the matter to have been resolved.

Plaintiff does not cite any evidence in support of her denial. A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. Anderson, 477 U.S. at 249. Merely denying a proposed fact without pointing to any evidence in the record does not result in a proposed fact being considered disputed for summary judgment. Although Plaintiff failed to cite supporting evidence, she did attach five exhibits in support of her response - one of which being the declaration of Dan Hamilton. Merely attaching exhibits to a response to summary judgment is inadequate to establish or contradict the fact(s) subject to dispute. Pedroza v. Cintas Corp. No. 2, 397 F.3d 1065, 1069 (8th Cir. 2005) (citing Jaurequi v. Carter Mfg. Co., 173 F.3d 1076, 1085 (8th Cir. 1999)("[A] district court is not 'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'")(internal citation omitted)); Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). Here, even despite Plaintiff's technical noncompliance, referral to Hamilton's declaration does not disprove Defendant's fact. Hamilton's declaration is the exact evidence cited by Defendant and, accordingly, supports this fact. I find this fact to be uncontroverted.

24

47.     **Langley did not direct or encourage any employee to pull Rice's hair, make fun of her for any reason, call her names, refuse to run queries for her, or harass Rice in any way. Nor did Langley condone any such actions. Before Langley became aware of Rice's formal EEO complaint against her, Langley was not aware that Rice claimed that these events occurred. At no time did Langley act or fail to act with regard to any such harassment or allegation of harassment in whole or in part because of any EEO complaint or activity of Rice.**

Plaintiff disputes this fact, stating that Langley took no action to stop the hair pulling.

In support of this fact, Defendant cites paragraph twenty-six of Langley's declaration:

> I did not direct or encourage any employee to pull Rice's hair, make fun of her for any reason, call her names, refuse to run queries for her, or harass Rice in any way. Nor did I condone any such actions. Before I became aware of the content of Rice's formal March 2002 EEO complaint against me, I was not aware Rice contended any of these events had occurred. At no time did I act or fail to act with regard to any such harassment or allegation of harassment in whole or in part because of any EEO complaint or activity of Rice.

Plaintiff does not cite any evidence in support of her denial. A dispute of fact is considered genuine only if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party. <u>Anderson</u>, 477 U.S. at 249. Merely denying a proposed fact without pointing to any evidence in the record does

25

not result in a proposed fact being considered disputed for summary judgment. Although Plaintiff failed to cite supporting evidence, she did attach five exhibits in support of her response - one of which being the declaration of Jennifer Langley. Merely attaching exhibits to a response to summary judgment is inadequate to establish or contradict the fact(s) subject to dispute. Pedroza, 397 F.3d at 1069 (citing Jaurequi, 173 F.3d at 1085 ("[A] district court is not 'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'")(internal citation omitted)); Crossley, 355 F.3d at 1114. Here, even despite Plaintiff's technical noncompliance, referral to Langley's declaration does not disprove Defendant's fact. Langley's declaration is the exact evidence cited by Defendant and, accordingly, supports this fact. I find this fact to be uncontroverted.

48.    **Rice also claims that she was subjected to a hostile work environment because she was not given a bigger desk. She testified that she was placed right behind Ball, who had been demoted. She said he was very tall, and when he would get up from his desk, his chair would bump Rice. She asked for a bigger desk so that this would not occur. She was ultimately given a bigger desk.**

Plaintiff does not dispute this fact.

49.    **At one time Rice indicated to Langley in casual conversation that she did not have enough desk top space and that some of her work was placed on the program analyst's desk. Langley encouraged her to get as much work as she could**

26

filed in the "lektriever" room, which is an area for organized file storage. This was the same manner in which other employees with schemes assigned to them were encouraged to deal with large volumes of scheme folders. Langley also offered Rice the opportunity to move to a different desk. No action or inaction of Langley's with regard to desk space or location for Rice was motivated by any EEO complaint or EEO activity by Rice.

   Plaintiff does not dispute this fact.

   50. **Rice also claimed that a hostile work environment existed because she was unable to get certain supplies she requested. She testified that she eventually received an electric stapler that she had requested, but only when everyone in the room got one, after Rice filed a complaint. Before that, Rice testified, only one person in the room where she worked was provided an electric stapler, and that person was a friend of Langley. Rice testified that a part of the hostile work environment was that it took her 18 months to get a wrist rest. She testified that during that time, others had wrist rests only if they purchased them on their own.**

   Plaintiff does not dispute this fact.

   51. **On one occasion, Rice brought to Langley's attention her wish to have a different chair and more room around her desk. Langley understood both of these requests to relate to Rice's physical comfort. Langley responded to Rice's request on the same day Rice made the request, suggesting that Rice meet with her**

27

manager and the EEO reasonable accommodation coordinator for the IRS campus, so that Rice's need for a different work station could be coordinated as required by that office. Rice testified that it took the IRS eight months to get her a new chair, once she made the request. She did not know of anyone else who requested a new chair, but felt that eight months was "a little lengthy."

Plaintiff does not dispute this fact.

52. The ordinary procedure for obtaining office supplies in the FDC is to indicate supplies needed on a posted sheet. A secretary deals with these requests, and only in unusual circumstances would a request be brought to the attention of Langley or the unit manager. If an item is requested as an accommodation for a disability, or to deal with a health or physical problem, the ordinary procedure is for the employee to provide medical documentation of the need for the item. Neither Langley nor Ball recalls any request by Rice for an automatic stapler, a back pad, or wrist rest, or any other supplies other than a different chair. At no time did Langley or Ball deny Rice any supply item in whole or in part because of any EEO activity or complaint by Rice.

Plaintiff does not dispute this fact.

53. Rice testified that the problems that Langley had with Rice were not unique to Rice. Rather, according to Rice, Langley had problems with all fifty of the employees in the room in which she worked, except the five or six employees

28

**with whom Langley was friends. Rice estimated that four or five of the fifty had filed EEO complaints.**

Plaintiff does not dispute this fact.

### IV.     *ADDITIONAL UNCONTROVERTED FACTS*

In her response, Plaintiff did not offer additional uncontroverted facts in separately numbered paragraphs as required by Local Rule 56.1(a). Instead, she merely divided her response into four categories -- "Non-Selection," "Workload," "Hostile Work Place," and "Handicap Discrimination" -- accompanied by text purporting to explain how the materials attached to her response in opposition contradicted Defendant's claims.

Aside from the facts that appear to have been offered to contradict Defendant's uncontroverted fact numbers forty-six and forty-seven, the facts contained within the text of Plaintiff's response do not contradict any of the facts proposed by Defendant. As such, I will review the remaining facts as additional uncontroverted facts proposed by Plaintiff. As discussed above, Plaintiff merely attaches materials in support of her facts without citation. Although not required to review the materials to find admissible evidence that supports Plaintiff's facts, I will do so due to the limited number and short length of the respective exhibits. The facts typed in bold below are those that I find to be undisputed based on the admissible evidence before me.

29

1.      **Ernst knew before the selection of Rice's EEO activity**.

Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact number twenty-six above. I, therefore, find this fact also to be uncontroverted.

2.      **Ernst gave Rice a low score on the interview.**

Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact numbers twenty-four and twenty-five above. I, therefore, find this fact also to be uncontroverted.

3.      **Ernst states that he used only the interview scores, but kept a male off the selection list for not having FDC experience.**

Defendant does not dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact number twenty-four above. I, therefore, find this fact also to be uncontroverted.

4.      **The FDC experience was not listed as a requirement of the job.**

Defendant does not dispute this fact.

5.      **Ernst stated that the first selection he made as RAC at the Kansas City FDC included acceptance of seven analysts based solely on interview scores.** Rice's name was on the "Best Qualified" list. **His second selection consisted of two analysts. In this selection, ranking score was the sole deciding factor.** Rice did not

30

apply at that time. **Ernst's third selection was of five analysts; interview scores were again used. Rices's name was on the "Best Qualified" list.** Selection of the court witness was based only on the ranking score; Rice did not apply. Finally, the fourth selection was for an analyst and was based on interview scores alone. Neither Ernst nor Langley were involved in the process and an EEO counselor was present to make sure everything was fair. Rice was selected for this position.

        Defendant does not specifically dispute this fact. The portion of the proposed fact typeset in bold has already been found to be uncontroverted in Defendant's fact numbers nineteen and twenty-one, above. I did not locate any evidence in Plaintiff's exhibits that supported the remainder of the fact. Therefore, only the portion of Plaintiff's fact typeset in bold is uncontroverted.

      6.    **Ernst and Langley both knew of Rice's prior EEO involvement.**

        Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact numbers fifteen and twenty-six above. I, therefore, find this fact also to be uncontroverted.

      7.    **Langley states that she is the manager of managers.**

        Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact number three above. I, therefore, find this fact also to be uncontroverted.

8.     **Under her watch, Scheme 47 was dumped on Rice.**

Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact number thirty-one above. I, therefore, find this fact also to be uncontroverted.

9.     The dump scheme was assigned by Langley and referrals were given to Rice.

Defendant does not specifically dispute this fact. However, review of the exhibits attached to Plaintiff's response in opposition reveals evidence to the contrary. Paragraph ten of Langley's declaration states:

> At no time did I take or direct any action to increase Rice's workload following the March 22, 2001, meeting. The workload of the three units within the FDC is distributed by the unit manages. I generally become involved in workload distribution issues only when a unit manager has a concern regarding the distribution among units, or an Investigative Analyst or Investigative Aide has a concern about workload distribution within his or her unit.

This fact remains controverted.

10.     **At the mediation meeting, Langley was supposed to remove all but the Scheme 47. No action was taken for three weeks.**

Defendant does not specifically dispute this fact. Regardless, this proposed fact has already been found to be uncontroverted in Defendant's fact numbers thirty-seven and forty above. I, therefore, find this fact also to be uncontroverted.

32

11. **When Hamilton failed to take action, Langley took it to Ernst.**

Defendant does not specifically dispute this fact. Additionally, evidentiary support for this fact is contained in paragraph twenty-two of Langley's declaration, wherein she states:

> I followed up approximately two to three weeks after I gave directions to Hamilton, and found Hamilton had not yet completed the reassignment. I again directed Hamilton to complete the reassignment. I also reported to Ernst that the reassignment agreed to had not been completed, and Ernst directed Hamilton to proceed with the reassignment. I attributed Hamilton's failure to act as promptly as I expected to the fact that he was an inexperienced manager and was overwhelmed by the job. Back-up assistance was assigned to Rice on or about March 13, 2002. Hamilton's detail as acting manager ended March 24, 2002.

This fact is uncontroverted.

12. Rice's hair was yanked which caused great discomfort to the thyroid scar on her neck.

Defendant does not specifically dispute this fact. However, review of the materials attached in support of Plaintiff's suggestions in opposition does not reveal that this proposed fact is supported by admissible evidence. Page four, lines four through eight of Sheila Urum-Eke's affidavit states:

> I do work with hair and have done peoples hair on several occasions. I do not recall yanking Linda's hair at any time but might have flipped her ponytail or touched her hair. At no time did I get negative feedback or vibrations nor did I realize this was offensive to her in any way. I do not recall when I might have touched her hair and I cannot associate this with any certain situation.

33

This passage does not affirmatively establish that Plaintiff's hair was "yanked." Moreover, it says nothing about any pain that may have resulted. I did not locate any other evidence in Plaintiff's exhibits that spoke to this issue. Therefore, I find this fact to remain controverted.

13.     The name calling insulted and humiliated Rice in front of her co-workers.

Defendant does not specifically dispute this fact. However, review of the materials attached in support of Plaintiff's suggestions in opposition does not reveal that this proposed fact is supported by admissible evidence. This fact remains controverted.

14.     Sheila Urum-Eke's own statement says that the hair event did occur she just tries to down play it.

Defendant does not specifically dispute this fact. However, review of the exhibits attached in support of Plaintiff's suggestions in opposition does not reveal that this proposed fact is supported by admissible evidence. Page four, lines four through eight of Sheila Urum-Eke's affidavit states:

> I do work with hair and have done peoples hair on several occasions. I do not recall yanking Linda's hair at any time but might have flipped her ponytail or touched her hair. At no time did I get negative feedback or vibrations nor did I realize this was offensive to her in any way. I do not recall when I might have touched her hair and I cannot associate this with any certain situation.

This passage does not establish that the "hair event" did, in fact, occur. Rather, Urum-Eke's affidavit merely states that she "*might* have flipped [Plaintiff's] ponytail or touched

34

her hair" and that she did not recall when this event may have occurred. I did not locate

any other evidence in Plaintiff's exhibits that spoke to this issue. Therefore, I find this

fact is controverted.

15.    Rice went to Langley on several occasions to ask for items.

Defendant does not specifically dispute this fact. However, review of the

exhibits attached in support of Plaintiff's suggestions in opposition reveals that this

proposed fact is not supported by admissible evidence. Paragraphs twenty-four and

twenty-five of Langley's declaration state, respectively:

> On one occasion, Rice brought to my attention her wish to have a different
> chair and more room around her desk. I understood both of these requests
> to relate to Rice's physical comfort. I responded to Rice's request on the
> same day Rice made the request. I suggested Rice meet with her manager
> and the EEO reasonable accommodation coordinator for the IRS campus,
> so that Rice's need for a different work station could be coordinated as
> required by that office.

> The ordinary procedure for obtaining office supplies in the FDC is to
> indicate supplies needed on a posted sheet. A secretary deals with these
> requests, and only in unusual circumstances would a request be brought to
> my attention. If an item is requested as an accommodation for a disability,
> or to deal with a health or physical problem, the ordinary procedure is for
> the employee to provide medical documentation of the need for the item. I
> do not recall any request by Rice for an automatic stapler, a back pad, or a
> wrist rest, or any other supplies other than a different chair as indicated
> above. I first became aware that Rice contended she had been denied
> supplies after she filed her formal complaint of discrimination. At no time
> did I deny Rice any supply item in whole or in part because of any EEO
> activity or complaint by Rice.

Langley's declaration establishes that Plaintiff asked for a different chair on one occasion and that her request was handled that same day. This contradicts Plaintiff's proposed fact that she asked for items on several occasions.

## V.    BURDEN-SHIFTING FRAMEWORK

Because there is no direct evidence of discrimination or retaliation, the burden-shifting scheme developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies to this case. A plaintiff must, therefore, first establish a prima facie case of discrimination or retaliation. Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997); Montadon v. Farmland Ind., 116 F.3d 355, 359 (8th Cir. 1997). Once a prima facie case is established, a legal presumption of unlawfulness is created. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). The burden of production then shifts to the defendant to articulate a legitimate non-discriminatory or non-retaliatory reason for the adverse employment action. Ledergerber, 122 F.3d at 1144; Montadon, 116 F.3d at 359.

If the defendant comes forward with a non-discriminatory explanation, the presumption of unlawfulness drops from the case. See St. Mary's Honor Ctr., 509 U.S. at 510-11. The burden of production then returns to the plaintiff to rebut the defendant's explanation by showing that the proffered reason is mere pretext for discrimination or retaliation. Ledergerber, 122 F.3d at 1144; Montadon, 116 F.3d at 359. In order to rebut the explanation, the plaintiff must present evidence that both creates a question of fact as

Case 4:04-cv-00279-REL    Document 63    Filed 04/11/06    Page 36 of 52

to whether the proffered reason is pretextual and creates a reasonable inference that the real motive was unlawful. Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002). Showing pretext requires more substantial evidence than that required to make a *prima facie* case. Logan v. Liberty Healthcare Corp., 416 F.3d 877, 881 (8th Cir. 2005).

## VI. RETALIATION

In order to establish a *prima facie* case of retaliation, a plaintiff must show "(1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection between the protected activity and the adverse employment action." Shackling v. Fitzgerald, 397 F.3d 596, 603 (8th Cir. 2005). A protected activity includes, *inter alia*, opposing an unlawful practice, making an EEO complaint or otherwise participating in an EEO proceeding. 42 U.S.C. § 2000e-3. An adverse employment action effectuates "a tangible change in working conditions that produces a material employment disadvantage." Spears v. Missouri Dept. of Corr. and Human Res., 210 F.3d 850, 853 (8th Cir. 2000). "Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Id. (internal citations omitted). Finally, the causal connection may be established by showing "that an employer's 'retaliatory motive played a part in the adverse employment action.'" Kipp v. Mo. Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002)(citing Sumner v. United States Postal Serv., 899 F.2d 203, 208-09 (2d Cir. 1990)).

37

### A. Non-Selection

In this case, Plaintiff cannot establish a *prima facie* case that her non-selection was retaliation for previous EEO activity. Plaintiff is able to prove that: (1) she engaged in a protected activity, that is, making an EEO complaint; and (2) she suffered an adverse employment action as a result of not being selected for a promotional opportunity. She is not able to prove, however, the requisite causal link between the two.

The undisputed facts are that Ernst and Langley were both members of the three-member selection panel for the position Plaintiff did not receive due to the alleged retaliation. Both Langley and Ernst knew of Plaintiff's prior EEO activity at the time of the selection. However, the undisputed facts also show that neither Ernst nor Langley were influenced by this knowledge in making their respective selection decisions. It is undisputed that Langley did not hold it against Plaintiff that Plaintiff had filed an EEO complaint against Whited, and held no opinion as to the merit of that complaint. At no time was her knowledge of that complaint a motivating factor in any action she took or failed to take toward Plaintiff. The scores Langley assigned were based exclusively on her judgment on the quality of Plaintiff's responses to the interview questions.

Likewise, Ernst did not know the identity of the person against whom Plaintiff filed the EEO complaint and had no opinion regarding its merit. Neither the complaint nor any other EEO activity by Plaintiff was a motivating factor in any action he took in connection with the selection. Ernst's decision to base the selection process on

38

interviews was unrelated to Plaintiff or any of her activities. The scores Ernst assigned to Plaintiff's interview responses were not affected by her EEO complaint or any EEO activity but, instead, were based solely on his evaluation of Plaintiff's responses.

At no time during the selection process did Langley or Ernst discuss Plaintiff's prior EEO activity between themselves or with Cassandra Blackwell, the third individual on the three-member selection panel. Blackwell had no knowledge of Plaintiff's prior EEO activity. For the eleven questions asked, Langley and Blackwell each gave Plaintiff a total score of 31 points and Ernst gave her a total score of 29 points. None of the panel members observed anything during the interview or scoring process that indicated Plaintiff's scores were influenced by anything other than a good faith evaluation of her responses.

Although in some instances temporal proximity may create an inference of causation, the undisputed facts of this case do not create such an inference. In order for the timing between Langley and/or Ernst learning of Plaintiff's previous EEO activity and her subsequent non-selection to support an inference of retaliation, the temporal proximity must be "very close." Wallace v. Sparks Health Sys., 415 F.3d 853, 859 (8th Cir. 2005). Periods of time as short as three months have been found insufficient to establish the causal link. Id. (citing Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)("citing cases in which a three-month period and a four-month period, respectively, were insufficient"); Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989

Case 4:04-cv-00279-REL   Document 63   Filed 04/11/06   Page 39 of 52

(8th Cir. 1999)("stating that a four-month gap, standing alone, weakened the showing of a causal link in a retaliation claim")); see also Krough v. Cessford Constr. Co., 336 F.3d 710, 712 (8th Cir. 2003)(stating nine-month gap weakened inference of retaliation).

Here, Plaintiff filed the Whited complaint in October of 2000. Langley did not learn of this activity until March 22, 2001, Ernst learned at some point prior to the selection process, and Blackwell never knew. The selection process itself did not take place until November of 2001. As a result, almost a year separates the time at which Plaintiff filed the Whited complaint and the time the selection process was conducted; there is an approximate eight-month gap between the time Langley learned of Plaintiff's previous EEO activity and the selection. This period of time is insufficient to support a causal inference alone, and certainly coupled with the undisputed facts set forth above establishing that none of the members of the selection panel were influenced by Plaintiff's previous EEO activity. Defendant's motion for summary judgment on this basis will be granted.

Even if Plaintiff were able to establish a *prima facie* case of retaliation, Defendant's summary judgment motion would still be granted because he has articulated a legitimate, non-retaliatory reason for Plaintiff's non-selection and Plaintiff is unable to establish that Defendant's reason for her non-selection is mere pretext. It is undisputed that selection for the analyst position in November of 2001 was based on interview scores and that Plaintiff's score was not amongst the top scores. The decision to conduct the

40

selection process in this manner is not inconsistent with previous selections conducted by Ernst. Plaintiff does not dispute that it was Ernst's general practice to assign ranking scores in accordance with the "best qualified" list. Only when there were distinct breaks in the ranking scores would Ernst make selections on ranking score alone. When there were not discernable breaks he would, instead, use the ranking scores to award interviews and then make the ultimate selection based on the applicant's interview score. This evidence would satisfy Defendant's burden of production of articulating a non-retaliatory reason for Plaintiff's non-selection.

Plaintiff offers no formal argument that Defendant's reason for her non-selection was pretext; however, her proposed fact number three that a male was kept off the selection list for not having FDC experience may be construed as such. The fact that another applicant did not receive one of the five available positions due to lack of experience with the FDC, despite having the third highest interview score, does not create a reasonable inference that the "real motive" behind Plaintiff's non-selection was unlawful. Nor does this fact constitute the substantial evidence necessary to prove pretext.

### B. Workload

Plaintiff's allegation that she received a increased workload in retaliation for EEO activity encompass two different time periods. Specifically, Plaintiff's formal EEO complaint and EEO affidavit state that her workload tripled within two weeks of her

Case 4:04-cv-00279-REL   Document 63   Filed 04/11/06   Page 41 of 52

March 22, 2001 meeting with Langley.  The EEO affidavit and Plaintiff's own deposition testimony also demonstrate that she again received additional work following the November 7, 2001, investigative analyst promotions.  Because the analysis is different with regard to the respective increases, each will be addressed in turn.

**1.      March of 2001 Increase**

Before bringing a Title VII claim in federal court, a plaintiff must first exhaust her administrative remedies.  <u>Burkett v. Glickman</u>, 327 F.3d 658, 660 (8th Cir. 2003).  Initially, a plaintiff must "'initiate contact' with an Equal Employment Opportunity (EEO) counselor 'within 45 days of the date of the matter alleged to be discriminatory.'" <u>Burkett</u>, 327 F.3d at 660; <u>see</u> <u>also</u> 29 C.F.R. § 1614.105(a)(1).  If the matter is not resolved, she must timely file a charge and receive a right to sue letter before proceeding in federal court.  <u>Faibisch v. Univ. of Minnesota</u>, 304 F.3d 797, 803 (8th Cir. 2002); <u>see</u> <u>also</u> <u>Shannon v. Ford Motor Co.</u>, 72 F.3d 678, 684 (8th Cir. 1996).  When these exhaustion requirements are not met, summary judgment is appropriate.  See Burkett, 327 F.3d at 660.

Plaintiff claims that her workload tripled within two weeks of her March 22, 2001, meeting with Langley.  She did not meet with an EEO counselor, however, until December 21, 2001.  This meeting occurred approximately thirty-three weeks after the alleged act of discrimination and well beyond the mandatory forty-five day deadline established by 29 C.F.R. § 1614.105(a)(1).  Therefore, Plaintiff has not exhausted her

42

administrative remedies with regard to this claim of an increased workload and summary judgment is appropriate.

**2.      November of 2001 Increase**

Plaintiff has exhausted her remedies with regard to her allegation of receiving an increased workload in November of 2001. However, she is unable to establish a *prima facie* case. Plaintiff can, again, prove that she engaged in a protected activity; she cannot prove that she suffered an adverse employment action or the requisite causal connection.

Plaintiff maintains that receiving an increased workload constituted an adverse employment action. As stated above, "[t]ermination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects" are considered adverse employment actions, "but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Spears, 210 F.3d at 853. The increased workload here did not result in termination or reduction in pay or benefits; it obviously did not affect her future career prospects, as Plaintiff has since been promoted to a GS-9 Investigative Analyst and has held managerial positions. At most, the increased workload may have altered Plaintiff's work responsibilities, but such an effect is insufficient under this standard.

Next, Plaintiff cannot prove the causal connection between engaging in EEO activity and receiving an increased workload. It is unclear which EEO activity Plaintiff claims she was retaliated against for by being given additional work. Plaintiff's EEO

43

activities relevant to this case include the complaints she filed in October of 2000, and on March 15, 2002. Plaintiff states that she was given an increased workload following the November 7, 2001, investigative analyst promotions. Since this event occurred before she even met with an EEO counselor on December 21, 2001, the filing of Plaintiff's second complaint could not have been a motivating factor in the increase.

Temporal proximity between Plaintiff's first complaint and the November 2001 increase do not create an inference of causation, either. As stated in section VI-A above, in order for the timing between Plaintiff filing the EEO complaint and her subsequent increase in workload to support an inference of retaliation, the temporal proximity must be "very close." Wallace, 415 F.3d at 859. Almost one year separates these two events. Although the time period between Langley learning of Plaintiff's previous EEO activity and the increased workload in somewhat shorter, this period alone is not enough to support a causal inference. Moreover, there are no facts to support an inference that Langley took or directed any action to increase Plaintiff's workload in retaliation for engaging in protected EEO activity. Defendant's motion for summary judgment is granted.

Even if Plaintiff were able to establish a *prima facie* case, Defendant's motion for summary judgment would still be granted because he has articulated a legitimate, non-retaliatory reason for the additional work Plaintiff received. It is undisputed that work often had to be redistributed amongst Investigative Aides due to retirements and

44

departures to other jobs. Workloads fluctuated depending on the tax season and as a part of the normal course of business. Plaintiff received additional work, including Scheme 47, after McNeil had been promoted to a new position. Langley was not responsible for distribution of work assignments and did not direct anyone to increase Plaintiff's workload. To the contrary, as soon as Langley learned of Plaintiff's complaint, she immediately directed Hamilton to reduce her workload. Langley and Plaintiff both attributed Hamilton's failure to act as promptly as expected to the fact that he was an inexperienced manager and overwhelmed by the job.

Plaintiff does not offer any facts suggesting that Defendant's proffered reasons are mere pretext. Although she argues that Langley, as the "manager of managers" should be held responsible, this argument does not constitute the substantial evidence needed to rebut Defendant's explanation.

### VII. HOSTILE WORK ENVIRONMENT

A hostile work environment under Title VII occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Bradley v. Widnall, 232 F.3d 626, 631 (8th Cir. 2000)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). In a case involving allegations of a hostile work environment, a plaintiff is required to prove that: "(1) she is a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus

45

existed between the harassment and the protected group status; and (4) the harassment affected a term, condition, or privilege of employment." Hesse v. Avis Rent A Car Sys., Inc., 394 F.3d 624, 629 (8th Cir. 2005). When the alleged hostile work environment is perpetrated by non-supervisory coworkers, the plaintiff must also prove that "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999). Factors considered in determining whether the alleged harassment was sufficiently severe or pervasive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Bradley, 232 F.3d at 631 (quoting Harris, 510 U.S. at 23).

Here, the parties do not dispute that Plaintiff is a member of a protected class, but disagree about the remaining elements. According to the undisputed facts, Plaintiff's hostile work environment claim is based on Langley: (1) persuading Plaintiff's co-workers to make fun of her workload, pull her hair, and call her names; (2) refusing to let her move her desk; (3) failing to order Plaintiff a back pad and an electric stapler; and (4) failing to require the Investigative Analyst assigned to her to give her more assistance with queries. Plaintiff cannot establish that any of these alleged harassing incidents occurred.

46

With regard to the first basis for Plaintiff's hostile work environment claim, the undisputed facts demonstrate that Langley did not direct or encourage any employee to pull Plaintiff's hair, make fun of her for any reason, call her names, or harass Plaintiff in any way. Langley did not condone any such activities, either. Second, it is undisputed that Langley offered Plaintiff the opportunity to move to a different desk. The undisputed evidence also shows that neither Langley nor Ball recalled Plaintiff making a request for either a back pad or an electric stapler. Finally, Langley did not direct or encourage the Investigative Analyst assigned to Plaintiff to refuse to run queries, nor did she condone such inactivity.

Even if Plaintiff had proven the alleged harassment occurred, she could not show a causal nexus between the harassment and her protected status. At no time did Langley act or fail to act with regard to Plaintiff's allegations of being made fun of, having her hair pulled, being called names, or other employees refusing to run queries because of any EEO complaint or activity by Plaintiff. Moreover, Langley's actions or inactions with regard to Plaintiff's request to move her desk to a different location were not motivated by the filing of an EEO complaint or other EEO activity. Neither Langley nor Ball denied Plaintiff supply items due to her EEO activity. In fact, Plaintiff did receive an electric stapler, but at the same time everyone else in the room also got one.

In addition, as Plaintiff's manager, Langley did not know - and should not have known - about the alleged harassment. She did not learn that Plaintiff claimed she was

47

made fun of for any reason, was subjected to name-calling and/or hair-pulling or that other employees refused to run queries for her, until after Plaintiff filed a formal EEO complaint. As a result, Plaintiff's hostile work environment allegations fall short of that contemplated by Title VII. Defendant's motion for summary judgment on this basis is granted.

Even if Plaintiff were able to establish a *prima facie* case a hostile work environment, Defendant's summary judgment motion would still be granted because he has articulated a legitimate, non-discriminatory reasons for the alleged harassment. The undisputed facts offered by Defendant, based on Plaintiff's own deposition testimony, are that if Plaintiff were made fun of due to her workload, it was because the other employees worked more slowly and were "uncomfortable with [her] superior work output." She was called "teacher's pet" because "Hamilton would [go] to her because she was a fast worker and ask her to finish as much work as possible so that his numbers would look good." Similarly, if Plaintiff's hair were pulled, Urum-Eke explained that she may have "flipped" Plaintiff's ponytail because she "works with hair." Hamilton considered the alleged incident to be a non-issue, as he never heard back from Plaintiff after she spoke to Urum-Eke about her concerns.

As found above, Langley did offer Plaintiff the opportunity to move to a different desk. Plaintiff got an electric stapler at the same time as other employees. The undisputed facts further show that when Langley received a supply request from Plaintiff,

48

she acted on the request that same day; Langley did not recall ever having received a request for a back pad and Plaintiff does not offer any evidence to the contrary. Defendant does not offer a non-retaliatory explanation for Plaintiff's allegation that Langley directed other employees not to run queries for her. This omission is not fatal, however, in light of the undisputed facts that (1) Langley did not direct, encourage, or condone any employee's refusal to run queries for Plaintiff and (2) Langley was not aware of this allegation until Plaintiff filed a formal EEO complaint against her.

Plaintiff does not offer any facts suggesting that Defendant's proffered reasons were mere pretext or argue otherwise.

## VIII.   HANDICAP DISCRIMINATION

As discussed more fully in Section VI-B, above, a plaintiff must first exhaust her administrative remedies before brining a claim in federal court.  See Burkett, 327 F.3d at 660.  As with Title VII claims, a plaintiff must also exhaust her administrative remedies when bringing a handicap claim under the Rehabilitation Act.  Morgan v. United States Postal Serv., 798 F.2d 1162, 1165 (8th Cir. 1986); see also Gardner v. Morris, 752 F.2d 1271, 1278-79 n.7 (8th Cir. 1985).  Plaintiff did not exhaust her administrative remedies with regard to her handicap discrimination claim; summary judgment, therefore, will be granted.

The undisputed facts do not show that Plaintiff ever met with an EEO counselor concerning the alleged handicap discrimination.  Rather, Plaintiff met with a counselor on

49

December 21, 2001, only concerning her complaints that she had an increased workload and had not been selected for a promotional opportunity due to gender discrimination and retaliation for a previous EEO complaint.[2]  On March 15, 2002, Plaintiff filed a formal EEO complaint.  The sole form of discrimination alleged was retaliation for EEO activity; she did not indicate in any fashion that she had suffered discrimination as a result of a handicap.  On April 5, 2002, the Treasury Complaint Center sent Plaintiff a letter defining the issues for investigation and requesting notification if she disagreed with the statement of issues.[3]  Plaintiff responded on April 15, 2005, by adding five issues to her complaint[4]

_____

[2]The EEO Counseling Report states:

The aggrieved person, Linda Rice, alleges that she was discriminated against when she was assigned an increased workload after informing management that she had an EEO complaint in process, and when she was non-selected for a promotional opportunity due to her sex (female) and in retaliation for her involvement in the EEO Process.

[3] The issues, as defined by the Department of the Treasury, were:

Whether the Complainant was retaliated against for her prior EEO activity when: (1) she was not selected for the position of Investigative Analyst, GS-1801-9, vacancy announcement number CIN-01-FD-KC-460, on or around November 7, 2001; (2) she has been assigned a heavier workload than comparable employees; and (3) she has been subjected to a hostile working environment.

[4]Plaintiff's letter stated she wished to add the following issues to her formal EEO complaint:

1) The team leader gave a mock interview to one of the selectees and then sat in on the official interview.  This selectee stated that she just repeated what the team leader told her to say.  I believe this would be pre-selection.
2) The hostile work environment is still occurring on a daily basis.  The

50

- none of which pertained to handicap discrimination. As a result, Plaintiff may not now

bring her handicap claim in this court for the first time. Summary judgment is granted in

favor or Defendant on this issue.

## IX.     CONCLUSION

Based on the above findings of undisputed facts and the law as discussed in

sections V - VIII, I find that no genuine issues of material fact exist on Plaintiff's claims

of retaliation - based on both non-selection and increased workload, hostile work

environment, or handicap discrimination, and that Defendant is entitled to summary

judgment as a matter of law.

Therefore, it is

---

analysts assigned by the team leader has not assisted in any way in
developing the schemes assigned to me. I have asked for queries to be run
with no results. I went to my first line manager, and then to the next
manager and have also made the team leader aware. As of this date
nothing has been done.
3) Another investigative aide has been given tools that only the
investigative analysts were supposed to be able to use. I would like to
know why all aides are not getting the same tools to do the same job?
4) An aide hired in December of 2001 has already been approached about
becoming an analyst. I believe this would also be pre-selection.
5) In the selection process, out of all the certs in 2001 only the one where
my name appeared did it take an interview and selection to fill. The other
certs including the same position I applied for, going right down the list
was good enough. In an ADR meeting the Branch Chief said that there
was no break point but after looking at the cert, they needed to fill 4
positions and a four-point break occurred after the top five BQ names.

51

ORDERED that Defendant's Motion for Summary Judgment is granted.


                                    /s/ Robert E. Larsen
_____     ROBERT E. LARSEN
                                    United States Magistrate Judge


Kansas City, Missouri
April 11, 2006

Case 4:04-cv-00279-REL   Document 63   Filed 04/11/06   Page 52 of 52